UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 4:20CR210 JAR(SPM) |
| ROBERT LEWIS | ) ) ) |
| Defendant. | ) ) |

### REPORT AND RECOMMENDATION, ORDER AND
### MEMORANDUM OPINION OF UNITED STATES MAGISTRATE JUDGE

This matter was referred to the undersigned United States Magistrate Judge for all pretrial matters pursuant to 28 U.S.C. §636(b). Defendant Robert Lewis is charged in a one-count superseding indictment with being a felon in possession of a firearm on February 16, 2020. Lewis has moved to suppress evidence of the firearm on grounds that police seized it as the fruit of an unconstitutional detention. At issue is whether police officers violated Lewis' Fourth Amendment rights when they approached, chased, and ultimately detained him. For the reasons set out below, I find that neither Lewis' initial detention nor subsequent arrest violated the Constitution. As such, I recommend that Lewis' Motion to Suppress be denied.

#### PROCEDURAL BACKGROUND

Lewis was arrested for the instant offense on August 14, 2020 and appeared for an initial appearance and arraignment the same day before the Honorable David D. Noce. At the arraignment, Lewis entered a plea of not guilty to the indictment and, through counsel, requested time to review discovery and file any necessary pretrial motions. In compliance with the scheduling orders entered by the undersigned, on December 11, 2020, defense counsel filed the

following pretrial motions: (i) Motion to Suppress evidence (Doc. 30); (ii) Motion for Disclosure of Expert (Doc. 31); (iii) Motion for Disclosure of 404(b) evidence (Doc. 32); and (iv) Motion for Court Order Pursuant to Due Process Considerations (Doc. 33). The United States filed a written response to Lewis' Motion to Suppress (Doc. 30) but did not oppose any of the other pretrial motions. After conferring with counsel for both parties, the undersigned scheduled a video evidentiary hearing on February 16, 2021.

On February 16, 2021, the parties appeared for an evidentiary hearing. Based on the record made at the time of the evidentiary hearing, Lewis' motions for disclosure of expert material and 404(b) in advance of trial are not in dispute. Assistant United States Geoff Ogden stated on the record that the United States agreed with Lewis' request for expert material and 404(b) material and agreed with the requested timing of the disclosures. As such, those motions are moot and will not be addressed in this Report and Recommendation.

Lewis' motion for a court order pursuant to due process considerations is also moot. At the evidentiary hearing, defense counsel clarified that the motion was predicated on the new requirements set out in Fed. R. Crim. P. 5(f) regarding disclosures of exculpatory evidence. Defense counsel confirmed that he is unaware of any violation of Rule 5(f) and stated on the record that he believes he has received all disclosures his client was entitled to receive under the rule and under *Brady v. Maryland* and its progeny. As such, Lewis' motion for an order pursuant to due process considerations will not be addressed in this Report and Recommendation.

At the evidentiary hearing, the United States offered the testimony of St. Louis Metropolitan Department ("SLMPD") Officers Blake Moe, Mathew Shoults, and Detective Joshua McCool. The United States also introduced into evidence audio recordings of police radio transmissions during the incident (Govt. Exs. 1 & 2) and photographs of the area in question (Govt.

Exs. 3-6). In addition to cross examining the government witnesses, Lewis introduced into evidence a police report about the incident (Deft. Ex. B), a transcript of two radio transmissions (Deft. Ex. D), a state search warrant package (Deft. Ex. E), and a satellite view and google street map of Nebraska Avenue (Deft. Ex. F). Finally, the parties stipulated to Lewis' address at the time of his arrest.

At the close of the hearing, the parties requested, and were granted, time to request a transcript of the hearing and to file post-hearing briefs. Post-hearing briefing was completed on March 26, 2021; as such, Lewis' motion to suppress is ready for a ruling.

After carefully considering the evidence presented at the hearing, the written submissions of the parties, and the applicable law, I make the following findings of fact and conclusions of law.

### FINDINGS OF FACT

In December 2019, St. Louis Metropolitan Department ("SLMPD") Officers Blake Moe, Christopher Narez, and other members of the SLMPD began investigating suspected drug trafficking activities at a house near Pennsylvania and Potomac Avenues in the Gravois Park neighborhood in the City of St. Louis. By early January 2020, the investigative team of officers had identified 3450 Pennsylvania Avenue as a suspected drug house in the area through the use of surveillance and information from an informant who had been stopped as a suspected drug-purchaser. Officers then began conducting regular surveillance of the residence to locate further foot and/or vehicle traffic to and from the suspected drug-house. Based on the officers' experience and training, activities they observed while surveilling 3450 Pennsylvania, including the presence of multiple cars registered to drivers from more rural areas visiting the residence, was consistent with drug trafficking activity.

On the evening of February 16, 2020, Officer Shoults was conducting roving surveillance

3

of the suspected drug house in an unmarked police vehicle. At approximately 7:00 p.m., while driving on Potomac Avenue, Officer Shoults observed four individuals in a stairwell near the house whereinvestigators previously observed suspected drug trafficking activity. Officer Shoults radioed members of his investigative team to inform them of his observations. This included Detective Josh McCool, Officer Moe, and Officer Narez. Officer Narez was in his own vehicle, while Officer Moe and Detective McCool were in a vehicle together, so the officers' communications took place over radio and were captured in the recorded radio transmissions submitted to the Court.

    Because he was conducting a roving surveillance to avoid detection, Officer Shoults did not stop his vehicle; instead, he drove past the four individuals in the stairwell then turned his vehicle around after passing the stairwell in order to drive by the group additional times. Officer Shoults described for other officers the number of individuals in the stairwell and what they were doing. Officer Narez confirmed that this conduct was consistent with previously observed activity at the house, stating "That's their usual waiting spot. That's where they go. That's where they walk up to the gangway from." While he was attempting to turn around and make another surveillance pass by the stairwell, Officer Shoults lost sight of the individuals in the stairwell and informed the investigative team of that fact.

    At this point, another officer asked Officer Shoults if he could provide a description of the four individuals. Officer Shoults replied that "[i]t was a mix of males and females. One that'll stick out, he had like an orange faded jacket on." Officer Shoults did not provide any further details about the attire or appearance of the individuals he had observed in the stairwell. About two minutes after losing sight of the four individuals, Officer Shoults informed other officers that he "found all of them," and that they were on Nebraska, including the individual wearing the

recognizable orange jacket. Officer Shoults then drove past the group on Nebraska and confirmed to the other officers that it was the same group.

In response, Detective McCool, Officer Moe, and Officer Narez went to Nebraska and saw Defendant Robert Lewis and three other men on the sidewalk near Lewis' home.[1] Lewis was wearing all dark clothing but one of the individuals with him was wearing an orange jacket that appeared to fit the description given by Officer Shoults. As the officers approached Lewis and the other men, Officer Shoults was communicating over the radio and confirmed that they had arrived at the right group. Detective McCool and Officers Moe and Narez, who were in unform, got out of their marked police cars and Detective McCool asked the group of four men if they would speak to the officers. They did not shout, have lights or sirens on, draw their weapons, or order the group to stop.

Lewis responded to Detective McCool's request by running away approximately ten seconds after the officers first approached. The other three men, including the man in the orange jacket, stayed put. Detective McCool and Officer Narez pursued Lewis, commanding that he stop numerous times, while Officer Moe remained with the other three men Lewis had been with. Lewis eventually fell to the ground, allowing Detective McCool and Officer Narez to catch up to him.

When the officers reached Lewis, he was lying on his stomach with his hands concealed under his torso. Concerned that Lewis might be armed, Detective McCool demanded that he show his hands. When Lewis did not comply with his command, McCool warned Lewis he would administer a Taser if he did not comply.  McCool "drive stunned" Lewis with the Taser,

---

[1] The parties stipulated that Lewis lived on Nebraska at the time of his arrest but there was no evidence to suggest the officers were aware of Lewis' address before he was arrested.

5

which caused Lewis to reveal his hands and, in so doing, he tossed or released a firearm away from his body. The officers then placed Lewis into handcuffs and seized the firearm.

Detective McCool subsequently conducted a computer inquiry, which revealed that the firearm was stolen, and Lewis was a convicted felon with active arrest warrants from St. Louis City and County.  McCool then advised Lewis he was under arrest for Unlawful Possession of a Firearm, Resisting Arrest, and active warrants.

It is not at all clear from the hearing testimony and other evidence that Lewis was, in fact, one of the four individuals Officer Shoults initially observed in the stairwell near the suspected drug house on Pennsylvania Avenue. Although Officer Shoults initially testified that the four people he saw in the stairwell near the suspected drug house on Pennsylvania were the same four people he later saw on Nebraska, he later conceded that he had not been close enough to see the faces of the four people he saw on Pennsylvania; he could not say whether Lewis was or was not in the stairwell; and he was "honestly" "not sure if there were females there [in the initial group of four who later] left." *See* Hearing Tr. (Doc. 46) at p. 107.

Officer Shoults explained he believed the four people he saw on Nebraska were the same four people he initially saw near the house on Pennsylvania because the clothing of both groups appeared to be the same—in particular, the presence someone wearing an orange colored jacket. Officer Shoults suggested that because it was winter time and the four individuals he initially saw were wearing winter coats, his description of the group as being a mix of males and females was not based on any unique attire such as a skirt, shorts, or tank top. These discrepancies in the evidence suggest that Officer Shoults may have been mistaken when he informed Officers Narez, Moe, and Detective McCool that he had found the same four individuals on Nebraska.

## CONCLUSIONS OF LAW

Lewis contends suppression is warranted because police had no reasonable suspicion to approach him to perform an investigatory stop and no probable cause to detain him as he stood with three other men on the sidewalk, a few feet from his home. *See* Lewis Post-Hearing Br. (Doc. 50), at p. 2. In response, the United States contends that even though officers ***had*** reasonable suspicion to briefly detain Lewis and the other three men to further investigate suspected drug trafficking activity, they did not ***need*** reasonable suspicion to simply approach Lewis on the sidewalk and ask him to speak with them. The United States further contends that Lewis' unprovoked flight from police added to the officers' reasonable suspicion and furnished even more justification for Lewis' seizure by police. The undersigned will address each of these arguments in turn.

### A. POLICE DID NOT VIOLATE THE FOURTH AMENDMENT BY ASKING LEWIS TO TALK

The Eighth Circuit has held that "[n]ot every encounter between a police officer and a citizen constitutes a seizure under the Fourth Amendment." *United States v. Mabery*, 686 F.3d 591, 595 (8th Cir. 2012). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *Id.* at 595-96. To determine whether a particular encounter constitutes a seizure, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.* There is no "litmus-paper test" for distinguishing a consensual encounter from a seizure; so, courts must consider these matters on a case-by-case basis. *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). *See also Mabery*, 686 F.3d at 596 ("This test is necessarily imprecise, because it is designed to assess

the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation."). "Circumstances indicative of a seizure include the threatening presence of several officers, the display of a weapon, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mabery,* 686 F.3d at 596.

Based on the foregoing factual findings, when Detective McCool, Officer Moe, and Officer Narez first approached Lewis and the other three men, Detective McCool asked the men if they would speak with the officers. The officers were in uniform but did not shout, shine lights, draw weapons, or command the four men to "Stop!" The atmosphere does not appear to have been police-dominated as three officers approached four men on a public sidewalk. There is no evidence suggesting that the officers physically limited Lewis' movement in any way or otherwise behaved in a coercive manner when they first approached Lewis and the other three men. Indeed, although the other three men stay put, Lewis responded to the request to talk by running away no more than ten seconds after the officers first approached.

"Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street, or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497 (1983). "Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification." *Id.* at 497. Additionally, a seizure has not occurred, and the Fourth Amendment does not apply if an individual does not submit to officer commands to "stop." *United States v. Houston*, 920 F.3d 1168 (8th Cir. 2019) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (noting officers' commands to "wait" or even outright to "stop, in the name of the law!" do not amount to an

8

investigative stop when the suspect refuses such commands)). Indeed, "[i]f there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed." *Royer,* 460 U.S. at 497-98.

In sum, because Lewis' initial encounter with police does not constitute a seizure for Fourth Amendment purposes, Lewis' Fourth Amendment rights were not implicated, and no violation could have occurred at that point.

### B. LEWIS' INITIAL SEIZURE AND SUBSEQUENT ARREST DID NOT VIOLATE THE FOURTH AMENDMENT

Lewis was first seized for Fourth Amendment purposes after he fell to the ground and Detective McCool "drive stunned" him with a Taser to compel his compliance with Detective McCool's commands to show his hands. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (seizure occurs whenever an officer restrains an individual's liberty by physical force or a show of authority to which the individual submits). The Fourth Amendment requires that every search or seizure by a government agent be reasonable. U.S. Const. Amend. XIV. In general, unless they fall within a valid exception, searches and seizures are *per se* unreasonable and invalid unless based on probable cause and executed pursuant to a warrant. *See Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (Fourth Amendment imposes presumptive warrant requirement for searches and seizures); *Katz v. U.S.*, 389 U.S. 347, 357 (1967) (Fourth Amendment imposes presumptive warrant requirement for searches and seizures).

Investigatory stops— i.e., brief seizure by police officers that fall short of traditional arrests—are governed by the Fourth Amendment and are lawful when justified by reasonable articulable suspicion that an individual is engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 27 (1968). Reasonable suspicion is a lesser standard than probable cause; it exists when an officer can "point to specific and articulable facts, which, taken together with rational inferences

9

from those facts, reasonably warrant th[e] intrusion." *Id.* at 21.

"Reasonable suspicion requires that the officers' suspicion be based upon particularized objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime has been committed." *United States v. Smith,* 648 F.3d 654, 658 (8th Cir. 2011) (internal citations omitted). An "inchoate and unparticularized suspicion or hunch" is insufficient. *Terry,* 392 U.S. at 27 (internal quotation marks omitted). In determining whether the requisite degree of suspicion exists, the court must determine whether the facts collectively establish reasonable suspicion and not whether each particular fact establishes reasonable suspicion—the whole picture, i.e., the "totality of the circumstances" must be taken into account. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002); *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001). The court may consider any added meaning that certain conduct might suggest to experienced officers in the field, but the officer's reasonable suspicion cannot be "just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent [people].'" *Jones,* 269 F.3d at 927 (quoting *Reid v. Georgia,* 448 U.S. 428, 441 (1980)).

When, as in this case, there are multiple officers are involved in an investigation, their "collective knowledge" can "provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the . . . stop when there is some communication between the officers." *United States v. Mosley*, 878 F.3d 246, 254 (8th Cir. 2017) (quoting *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008)). The officer conducting the stop need not be informed of the specific articulable facts supporting the reasonable suspicion, so long as those facts exist. *See Smith*, 648 F.3d at 659 ("Police officers may rely upon notice from another police department that a person or vehicle is wanted in connection with the investigation of a felony when making a *Terry* stop, even if the [notice] omits the specific articulable facts supporting reasonable

10

suspicion") (internal citations and quotations omitted). "'When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop.'" *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007) (internal quotations omitted)).

      **1.** ***Police had reasonable suspicion to briefly detain Lewis and the other men to question them about the ongoing drug investigation on Pennsylvania.***

Based on the foregoing factual findings, when Detective McCool and Officers Moe and Narez first approached Lewis and the other three men on Nebraska Avenue, they collectively had reasonable suspicion to briefly detain the men and question them about suspected drug trafficking activity at the house on Pennsylvania Avenue. As of February 16, 2020, Officers Moe, Narez, and Shoults had been involved in an investigation of suspected drug trafficking activity at 3450 Pennsylvania since December 2019. By early January 2020, through surveillance and information from an informant, officers had identified 3450 Pennsylvania Avenue as a suspected drug house in the area. Officers then began conducting regular surveillance of the residence to locate further foot and/or vehicle traffic to and from the suspected drug-house. Based on the officers' experience and training, the activities they observed while surveilling 3450 Pennsylvania, including short visits by individuals in cars registered to of out-of-area residents, was consistent with drug trafficking activity.

On February 16, 2020, Officer Shoults was conducting roving surveillance of 3450 Pennsylvania Avenue when he saw four people, including one wearing an orange-colored jacket, on the stairwell of the suspected drug house. Officer Shoults radioed members of his investigative team—Detective Josh McCool and Officers Moe Narez to inform them of his

11

observations. When Officer Shoults described the number of individuals in the stairwell and what they were doing, Officer Narez confirmed that this conduct was consistent with previously observed activity at the house, stating "That's their usual waiting spot. That's where they go. That's where they walk up to the gangway from."

Officer Shoults described the people he saw as a "mix of males and females. One that'll stick out, he had like an orange faded jacket on." Although discrepancies in the evidence suggest that Officer Shoults may have been mistaken when he informed Officers Narez, Moe, and Detective McCool that he had found the same four individuals on Nebraska, he did not violate the Fourth Amendment by directing his team to approach Lewis and the other three men on Nebraska Avenue. The Eighth Circuit has recognized that where there is other corroborating information and reasonable explanations for any discrepancies, such discrepancies and inconsistencies "do not alone undermine reasonable suspicion." *Mosley,* 878 F.3d at 254. In any event, "the ultimate touchstone of the Fourth Amendment is reasonableness" and "[a]n action is reasonable under the Fourth Amendment, … as long as the circumstances, viewed objectively, justify the action." *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403-404 (2006).

Given the totality of the circumstances, it was not unreasonable for Officer Shoults to believe that Lewis and the other individuals he directed his team to approach on Nebraska Avenue were the same four individuals he saw on Pennsylvania Avenue. Lewis was in a group of four—the same number of people Officer Shoults reported he saw engaging in suspected drug trafficking activity on Pennsylvania—and was with an individual wearing an orange-colored jacket—which matched one of few descriptors called out by Shoults upon first observing the four individuals on Pennsylvania.

For the foregoing reasons, although no seizure occurred during the initial encounter, well

before Detective McCool used a Taser on Lewis, the officers collectively had reasonable suspicion to briefly detain Lewis to question him about the ongoing drug trafficking investigation. Lewis' flight from the police only heightened the officers' reasonable suspicion.

### 2. *Lewis' unprovoked flight furnished police with further reasonable suspicion to support Lewis' seizure.*

The Supreme Court and the Eighth Circuit have held that unprovoked flight may create a reasonable suspicion in a police officer that criminal activity is afoot and will justify the stop of the suspect. *See Illinois v. Wardlow,* 528 U.S. 119, 124 (2000) (holding that unprovoked flight is an act of evasion that is a relevant factor in determining reasonable suspicion); *see also United States v. Benson*, 686 F.3d 498, 502 (8th Cir. 2012) (holding that when police officers ordered a suspect to stop, the suspect's decision to increase his speed and try to evade the officers contributed to a finding of reasonable suspicion); *see also United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010) (holding that reasonable suspicion was justified when officers witnessed the suspect's flight at the sight of police). Although individuals have the right to refuse to cooperate with law enforcement absent reasonable suspicion of criminal activity, the Supreme Court has held that unprovoked flight "by its very nature, is not 'going about one's business;' in fact it is just the opposite." *Wardlow*, 528 U.S. at 125. The Court has further held that "[a]lowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." *Id.*

Here, as stated above, even before Lewis ran away police already had reasonable suspicion sufficient to justify a brief investigatory stop of Lewis. Lewis' decision to run away gave the pursuing officers additional reasonable suspicion, if not probable cause, to detain and search him. *See Freeman v. Adams,* No. 1:12CV86 SNLJ, 2014 WL 1056760, at *10 (E.D. Mo.

13

Mar. 19, 2014) (holding that the officer had probable cause to arrest plaintiff for resisting a lawful investigatory stop by fleeing in violation of Mo. Rev. Stat. § 575.150). Therefore, the officers' pursuit and subsequent seizure of Lewis did not violate Lewis' Fourth Amendment rights.

### 3. *Lewis' seizure and subsequent arrest did not violate the Fourth Amendment.*

Based on the foregoing factual findings, when the officers reached Lewis, he was lying on his stomach with his hands concealed under his torso. Concerned that Lewis might be armed, Detective McCool demanded that he show his hands. When Lewis did not comply with his command, McCool warned Lewis he would administer a Taser if he did not comply.  McCool "drive stunned" Lewis with the Taser, which caused Lewis to reveal his hands and, in so doing, he tossed or released a firearm away from his body. The officers then placed Lewis into handcuffs and seized the firearm.

In conducting an investigatory *Terry*-type stop, "[o]fficers must 'use the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop.'" *United States v. Newell,* 596 F.3d 876, 879 (8th Cir. 2010) (quoting *Terry,* 392 U.S. at 25-31). Where police exceed the permissible scope articulated in *Terry*, the investigatory detention is transformed into an arrest that must be supported by probable cause. *United States v. Aquino*, 674 F.3d 918, 924 (8th Cir. 2012). For example, a *Terry* stop may become an arrest, requiring probable cause, "if the stop lasts for an unreasonably long time or if officers use unreasonable force." *Newell,* 596 F.3d at 879.

However, officers may, without converting an investigatory *Terry* stop into an arrest, take any measures that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* "[W]hen officers are presented with serious danger

14

in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *Smith,* 648 F.3d at 654 (quoting *United States v. Fisher,* 364 F.3d 970, 973 (8th Cir. 2004)). *See also United States v. Danielson,* 728 F.2d 1143, 1146-47 (8th Cir.1984) (concluding investigatory detention did not become an arrest when the officers drew their weapons before approaching the vehicle occupied by suspected armed bank robbers). Given the totality of the circumstances, Detective McCool's decision to use the Taser was supported by reasonable suspicion that Lewis was armed and Taser-use necessary for officer safety.

Detective McCool's subsequent decision to place Lewis under arrest was supported by probable cause. "Probable cause to make a warrantless arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." *United States v. Parish*, 606 F.3d 480, 486 (8th Cir. 2010). In making this determination, "law enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (internal quotation marks and citation omitted). "Because probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest." *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (citation omitted), abrogated on other grounds by *Riley v. California,* 573 U.S. 373 (2014); *see also United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008).

In this case, at the time Lewis was placed under arrest, Detective McCool had conducted a computer inquiry which revealed that the firearm was stolen, and Lewis was a convicted felon

15

with active arrest warrants from St. Louis City and County. McCool then advised Lewis he was under arrest for Unlawful Possession of a Firearm, Resisting Arrest, and active warrants. In sum, Lewis' motion to suppress should be denied because his initial seizure by police was supported by reasonable suspicion which grew into probable cause before he was placed under arrest by Detective McCool.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Robert Lewis' Motion to Suppress (Doc. 30) be **DENIED**.

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

**IT IS HEREBY ORDERED** that Defendant Robert Lewis' Motion for Disclosure of Expert (Doc. 31) is **DENIED**, as moot.

**IT IS FURTHER ORDERED** that Defendant Robert Lewis' Motion for Disclosure of 404(b) evidence (Doc. 32) is **DENIED**, as moot.

**IT IS FURTHER ORDERED** that Defendant Robert Lewis' Motion for Court Order Pursuant to Due Process Considerations (Doc. 33) is **DENIED**, as moot.

**IT IS FINALLY ORDERED** that trial in this case will be set at a later date before the Honorable John A. Ross.

Dated: April 30, 2021

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE